CANDELL, Appellant, vs. SKAAR and another, Respondents.

*March 4—April 8, 1958.*

546

548

For the appellant there were briefs by *Hale, Skemp, Hanson & Schnurrer* of La Crosse, and oral argument by *T. H. Skemp.*

For the respondents there was a brief by *Thompson, Smyth & Flynn* and *Bunge, Coleman, Moen & Meyer* and *Bosshard & Arneson,* all of La Crosse, and oral argument by *John S. Coleman* and *Robert D. Smyth.*

FAIRCHILD, J. We conclude that there must be a new trial because of an inconsistency in the finding of the jury. Resolution of the inconsistency may result in a different finding on comparison of negligence. Other questions raised on the appeal will be discussed to the extent that may be helpful on a new trial.

(1) *Inconsistency in findings.* The jury found that defendants failed in their duty under the safe-place statute in respect to the edges of the treads and the edge of the landing. In the light of the stipulations of the parties and the instructions of the court, this amounted to a finding that these edges were not finished "with a nonslippery surface not less than three inches in width." The court instructed the jury that the building code required that the tread be not less than $9\frac{1}{2}$ inches in depth; that the tread was $8\frac{1}{2}$ inches in depth; and that they should find a failure of defendants to perform their duty in that regard, and the jury so found. The jury found that the second failure was a cause of plaintiff's fall, but that the first was not. The finding that the insufficient depth of the tread was a cause must be based on the proposition that when plaintiff's left foot was partially on and partially protruding over the tread, additional support which an additional inch of tread would have afforded would have tended to prevent her fall. It must follow that three inches of nonslippery surface at the edge of the tread would have had the same tendency. Where there is a failure to fulfil a duty under the safe-place statute and an accident occurs which performance of the duty was designed to prevent, the law presumes that the damage was caused by the failure. The presumption may be rebutted, but if not re-

butted by evidence, the plaintiff has met his burden of proof. *Umnus v. Wisconsin Public Service Corp.* (1952), 260 Wis. 433, 438, 51 N. W. (2d) 42. Considering plaintiff's description of her position just before she fell and of the manner in which she fell, which the jury accepted in finding that the shallowness of the tread was causal, there is no evidence tending to show that the failure to provide a nonslippery surface was not also causal. Under the circumstances, the comparison of fault cannot stand and a new trial is necessary.

(2) *Handrails.* Order Ind. No. 23.5116 (Building Code, effective July 29, 1942, reprinted, 1954) provided in part:

"3. Handrails. All stairways and steps of more than three risers shall have at least one handrail. Stairways and steps five feet or more in width, or open on both sides, shall have a handrail on each side. Where only one handrail is required it shall be placed on the left-hand side as one mounts the stairs, and on the open side, if any. . . .

"Stairways on the outside of buildings and an integral part thereof, having more than three risers shall have a handrail at each side, and if the stairway is more than 50 feet wide, one or more intermediate handrails shall be provided."

The stairway in the instant case has only three risers. While the quoted provisions do not insert the qualification "having more than three risers" each time the word "stairways" is used, careful analysis of the provisions leads us to the conclusion that such qualification is intended in these paragraphs on handrails and that no handrails are required on stairways or steps having three or fewer risers.

Plaintiff also points out a portion of Order No. 22, Industrial Commission General Orders on Safety, effective October 3, 1949, reprinted 1954, providing, "Exterior stairways or steps shall have a handrail at each side and if the stairway or steps is more than 50 feet wide, one or more intermediate handrails shall be provided." Generally the requirements of

this safety order parallel Order No. 23.5116 and again it fairly appears that the qualification "of four or more risers" while not repeated after every reference to stairways in this order was so intended in all provisions requiring handrails.

Thus the absence of a handrail on defendants' steps violated no industrial commission order.

(3) *Uniform risers.* The trial court correctly concluded that since plaintiff stepped down only one step, the lack of uniformity of risers could not have contributed to her fall.

(4) *Canopy.* No order of the commission requires a canopy. It has been considered that the safe-place statute, sec. 101.06, does not require protection of exterior portions of premises from the elements. *Holcomb v. Szymczyk* (1925), 186 Wis. 99, 202 N. W. 188; *Kezar v. Northern States Power Co.* (1944), 246 Wis. 19, 24, 16 N. W. (2d) 364. "When the commission has provided the necessary elements of safety applicable to a particular place it is not for the court or jury to establish others." *Waterman v. Heinemann Brothers Co.* (1938), 229 Wis. 209, 212, 282 N. W. 29; *Bent v. Jonet* (1934), 213 Wis. 635, 644, 252 N. W. 290. There is no evidence of any circumstance which subjects users of the steps now in question to any risks other than those typical of stairways which the commission must be assumed to have considered.

(5) *Expert testimony.* Plaintiff offered to prove by the testimony of an architect that in order to comply with the building code the risers should have been of uniform height; that the treads should have been uniformly $10\frac{1}{4}$ inches in depth; that the "nosings" of the steps should be of non-slippery material; and that a handrail would be required at each side of the steps. As to this offer the trial court correctly ruled that these requirements were to be determined by the court as a matter of law from the provisions of the code. Under *Allison v. Wm. Doerflinger Co.* (1932), 208 Wis.

206, 211, 242 N. W. 558, relied on by plaintiff, and *Bent v. Jonet* (1934), 213 Wis. 635, 644, 252 N. W. 290, expert testimony would be admissible to explain the meaning and practical application of the requirement of "nonslippery" surfacing. The architect was permitted to testify that such surfacing was absent and the jury so found.

(6) *Allegedly unfair references to plaintiff.* Plaintiff's counsel argues that defendants, through their counsel and medical witnesses, attempted to exploit plaintiff's unorthodox taste in personal decoration, her frequently requited thirst for beer, and other elements of her history. One of the doctors called by defendants described his examination of plaintiff and testified that she had 10 or 12 tattoos, "some on both ankles, both knees, both shoulders, both arms, and a two-inch eight-ball in the middle of her back." She said she had become pregnant at the age of nineteen; had her uterus and tubes removed; "denied ever having had venereal disease;" "had done a moderate amount of drinking but did not consider herself an alcoholic;" that she smokes about a package of cigarettes a day.

Plaintiff herself used one of her decorations as a sort of landmark. The other doctor called by defendants quoted her as telling him, "I hit right there where there is the eight-ball mark on my back. . . . I have pain in my back right at that one place. It is where I fell. It is just behind the eight-ball." Plaintiff's counsel apparently forecast that he would have a problem because the tattoos and beer drinking would be brought out. Plaintiff was his first witness, and he asked her if she did not have "quite a few" tattoos on her body and had not been "a frequenter of taverns."

For a long time after the fall, plaintiff had no feeling in her legs. She remained in hospitals until July 16, 1955. Thereafter she had been in a wheel chair for a time and had used crutches, or moved about home on hands and knees.

Some portion of sensation had returned by the time of trial. No doctor questioned the reality of her sensory loss, but the dispute between the doctors was whether it resulted from permanent injury to the spinal cord or a hysterical reaction to her fall. The doctor whose testimony was first described above and who diagnosed the condition as hysteria testified, "that from her past history, having lost her female organs at the age of nineteen; her history of some emotional instability, and she admitted to being a moderately heavy drinker and to the fact of the 10 or 12 tattoos, I would say she was a very susceptible candidate for a posttraumatic neurosis—all she needed to trigger it . . . the fall." Thus some, at least, of the facts brought out were considered as a basis for a medical conclusion.

After reviewing the record, we can only comment that upon a new trial, court and counsel ought to be, and undoubtedly will be, alert to avoid reference to facts which are immaterial, and as to those of plaintiff's peculiarities which are relevant, to avoid undue and prejudicial emphasis. The doctors might well be cautioned to avoid recital of facts which they cannot demonstrate are relevant to their medical conclusions. We do not see, for example, any justification for the doctor's assertion that plaintiff "denied" having had venereal disease, and in the context of this case, the reference may have been prejudicial.

Under the circumstances, we do not consider it advisable to limit the new trial to issues other than damages, because of the dispute on the extent of injury and the tendency of prejudice to affect the damage finding if there were prejudice. There was no argument in this court as to any separate defense of either defendant, and therefore both judgments will be reversed.

*By the Court.*—Judgments reversed, cause remanded with directions to grant a new trial.