Robert SZALACINSKI and Patricia Szalacinski,
Plaintiffs-Respondents-Cross-Appellants,

Perry SCHOBER, Elizabeth White
and SBC Communications,
Involuntary-Plaintiffs,

v.

Christopher A. CAMPBELL,
Defendant-Third-Party Plaintiff,

UNITED HEALTH CARE,
ABC Insurance Company,
Defendants,

AMERICAN FAMILY INSURANCE, Grand Marquis Inn,
Defendants-Appellants-Cross-Respondents,

HORACE MANN INSURANCE Companies,
Foremost Farms USA Erisa Self Funded,
Involuntary-Plaintiffs-Third-Party Defendants,

Leon GONNERING, Shirley Gonnering,
Involuntary-Plaintiffs-Third-Party Defendants-
Respondents-Cross-Respondents.

Court of Appeals

*No. 2007AP667. Oral argument April 3, 2008.
—Decided September 3, 2008.*

2008 WI App 150

(Also reported in 760 N.W.2d 420.)

286

On behalf of the defendants-appellants-cross-respondents, the cause was submitted on the briefs of *Terry J. Booth* of *Piper & Schmidt*, of Milwaukee, with oral argument by *Terry J. Booth*.

On behalf of the plaintiffs-respondents-cross-appellants, the cause was submitted on the brief of *Patrick W. Brennan* of *Crivello, Carlson, S.C.*, of Milwaukee, with oral argument by *Patrick W. Brennan*.

Before Curley, P.J., Fine, J., and Daniel L. LaRocque, Reserve Judge.

¶ 1. CURLEY, P.J. Grand Marquis Inn and its insurer, American Family Insurance (unless otherwise specified, collectively referred to as Grand Marquis), appeal from judgments entered in favor of Patricia and Robert Szalacinski and Leon and Shirley Gonnering, following a jury trial.[1] Grand Marquis challenges the evidence presented at trial, arguing that it failed to establish a violation of Wisconsin's safe-place law. In addition, Grand Marquis argues that no credible evidence was presented that causally connected any hotel

[1] Robert Szalacinski passed away prior to the trial. Throughout this opinion, Patricia and Robert Szalacinski will be referred to individually by first name and collectively as "the Szalacinskis." Likewise, Leon and Shirley Gonnering will be referred to individually by first name and collectively as "the Gonnerings."

Although other plaintiffs were awarded money by the jury as a result of the fire at Grand Marquis, American Family Insurance and Grand Marquis did not appeal from those awards.

defect and the injuries alleged and that the claims against it must be dismissed because the conduct of Grand Marquis was not a cause of those injuries. In the alternative, Grand Marquis asks that a new trial be granted because the jury verdict was contrary to law and to the weight of the evidence and resulted from errors in the special verdict and jury instructions. Lastly, American Family Insurance contends that its cross-claim was fully established, that it was not subject to the made whole doctrine, and that it is entitled to a pro-rata share of funds paid by the insurers of Christopher Campbell and Tameka Lukes.

¶ 2. The Szalacinskis cross-appeal, arguing that American Family Insurance waived its cross-claim by failing to object at the verdict conference to the form of the special verdict, which did not contain a liability question regarding causation as to its alleged property damage. Next, the Szalacinskis argue that American Family Insurance may not recover as a cross-claimant from the remaining surplus of the insurance policy proceeds paid by Campbell's and Lukes' insurers, and that American Family Insurance is barred from subrogation recovery because Grand Marquis' negligence was greater than the negligence of Lukes and Campbell.

¶ 3. We conclude that, as a matter of law, there is no credible evidence that Grand Marquis violated Wisconsin's safe-place law. Because that was the only theory of liability presented to the jury, we reverse and remand the case to the trial court to vacate the awards of damages to the Szalacinskis and the Gonnerings and dismiss their claims. In light of the dismissal of their claims, we need not address the Szalacinskis' argument in their cross-appeal that the evidence was insufficient to support the answers on the jury verdict finding that Patricia was negligent for jumping from the hotel

window at Grand Marquis. With respect to American Family Insurance's cross-claim, we conclude that there was no waiver, that the trial court's application of the made whole doctrine to limit its recovery was in error, and that it is entitled to recover from the funds paid by Campbell's and Lukes' insurers.

## I. BACKGROUND.

¶ 4. On September 15, 2001, the Szalacinskis were guests at Grand Marquis, a hotel located in Lake Delton, Wisconsin, and were staying in Room 205, which was on the second floor. Although there is some discrepancy in the record, it appears the Szalacinskis arrived at Grand Marquis without a reservation.[2] They requested a first-floor room because Robert had had a heart transplant approximately four years prior to their stay at Grand Marquis. In addition, at the time of the Szalacinskis' stay, Robert had adult-onset diabetes and wore hearing aids. Grand Marquis was unable to accommodate the Szalacinskis' request because no first-floor rooms were available.[3]

¶ 5. On the same date the Szalacinskis were staying at Grand Marquis, Campbell and Lukes were also staying there that evening, in Room 203, which was

[2] Specifically, there are inconsistencies in Patricia's testimony regarding whether the Szalacinskis had a reservation when they arrived at Grand Marquis. During her deposition, Patricia said they did not have a reservation. At trial, however, she was unsure of this fact. During his deposition, Robert said they did not have a reservation. Likewise, one of Grand Marquis' owners testified that based on hotel records, the Szalacinskis did not have a reservation.

[3] The entire first floor of rooms at the Grand Marquis contained smoking rooms, with the exception of some nonsmoking handicapped-accessible rooms.

next to the Szalacinskis' room. The Gonnerings were guests at Grand Marquis, staying in Room 202. It is undisputed that at some point during the evening, Campbell's and Lukes' careless use of candles resulted in a fire in their room. The fire was discovered at approximately 3:00 a.m. Although the fire itself was contained to Campbell's and Lukes' room, smoke permeated to other areas of the hotel.

¶ 6. Grand Marquis had ninety rooms for guests in 2001, and all were occupied on the night of the fire. Of the 210 guests staying at Grand Marquis that night, 207 were able to get out safely, with the exception of a few instances of minor smoke inhalation and glass cuts. The three individuals who suffered more severe injuries were Patricia, Leon, and Shirley. Aside from smoke inhalation, their injuries were sustained when they jumped out of, or, for Shirley, when she was dropped from, their second-floor hotel room windows.[4] Patricia suffered nine compound fractures in her left leg and a fracture in her right leg.[5] Leon severed tendons in one of his fingers, and Shirley injured her left hip, leg, and ankle, along with her lower back.

¶ 7. Due to the fire, Grand Marquis incurred property damage and business interruption losses. These losses, in addition to money paid for the medical expenses of Grand Marquis' guests, totaled $543,739.40, and were paid by American Family Insurance, as Grand Marquis' insurer.[6] American Family Insurance subse-

---

[4] Leon assisted his wife Shirley in evacuating through the hotel window by lowering her out of the window while holding her wrists.

[5] Robert remained in the hotel room and was eventually rescued. He suffered minor smoke inhalation injuries.

[6] The parties stipulated to this amount.

quently filed a cross-claim against Campbell and Lukes for reimbursement of that amount.

¶ 8. In their pleadings, the Szalacinskis alleged negligence and reckless disregard against Campbell, Lukes, and Grand Marquis. The Szalacinskis also alleged that Grand Marquis violated Wisconsin's safeplace law. Prior to trial, the insurers of Lukes and Campbell tendered their policy limits, for a combined total of $400,000, which, as reflected in the trial court's orders dismissing them and their insurers from the case, resulted in a finding that each was "causally negligent as a matter of law."[7]

---

[7] The trial court's order approving the tender of limits and dismissing Lukes and her insurer provided in part as follows:

> IT IS FURTHER ORDERED this dismissal of Tameka M. Lukes and Illinois Farmers Insurance Company is not intended to eliminate the inclusion of Tameka M. Lukes' name from appearing on the special verdict herein with regards to negligence, causation and apportionment of negligence nor prohibit the introduction of any evidence at trial regarding Tameka M. Lukes' involvement in the events surrounding this claim. *Tameka M. Lukes is causally negligent as a matter of law and shall be so found by the court on the special verdict.*

(Emphasis added.)

An analogous order was entered by the trial court with respect to Campbell and his insurer, which stated:

> IT IS FURTHER ORDERED that this dismissal of Christopher A. Campbell and Allstate Insurance Company is not intended to eliminate the inclusion of Christopher A. Campbell's name from appearing on the special verdict herein with regards to negligence, causation and apportionment of negligence nor prohibit the introduction of any evidence at trial regarding Christopher A. Campbell's involvement in the events surrounding this claim. *Christopher A. Campbell is causally negligent as a matter of law and shall be so found by the court on the special verdict.*

(Emphasis added.)

¶ 9. Trial testimony revealed that the owners of Grand Marquis hired Robert Nagel, a registered professional engineer, to be responsible for the initial design of the Grand Marquis structure, along with its two subsequent additions. In preparing his plans and specifications for the initial design and the additions that followed, Nagel submitted them to the State of Wisconsin Department of Commerce, which reviewed and approved them as being compliant with the building code. Grand Marquis had stand-alone smoke detectors in all of its rooms, a fire alarm system located in the common areas, and a compartmentalization design, which incorporated fire-resistant materials to confine a fire to the room of origin. No sprinkler system was ever installed.

¶ 10. Leonard Alexander, a Wisconsin Department of Commerce building inspector, conducted a final inspection of Grand Marquis and concluded that there were no violations and that the building complied with the code requirements. Alexander also confirmed that sprinklers were not required at Grand Marquis.

¶ 11. Richard Jordan, a state certified fire inspector, conducted a surprise alarm inspection with Andrew Schultz, the Delton fire chief, two weeks following the fire. Inspector Jordan testified that the fire alarm system was the same system that he had inspected at Grand Marquis prior to the fire. Inspector Jordan and Fire Chief Schultz activated the alarm system, and from within the rooms with the doors closed, they determined that the loudness associated with the alarm system was adequate.

¶ 12. The Szalacinskis' expert on fire protection and safety, Dale Wheeler, identified four areas, where, in his opinion, Grand Marquis had failed, which caused guests staying there to be "inordinately subjected to the fire that occurred on September of 2001, forced to take

unusual measures to protect their lives, [and] the lives of their families." The four areas referenced by Wheeler consisted of the following: (1) "lack of a sprinkler system in the hotel"; (2) "failure by the hotel owner to establish and [en]force reasonable fire safety precautions against incendiaries such as smoking and candles"; (3) "failure of the hotel owner to properly maintain the fire doors in the facility which are an inte[gral] part of the compartmentalization building concept used"; and (4) "at least three failures in the fire alarm system."

¶ 13. With respect to the lack of sprinklers in the Grand Marquis, Wheeler testified during his direct examination as follows:

> [Counsel for the Szalacinskis]: In your profession, Mr. Wheeler, would you say that sprinklers are the No. 1 suppressant system favored by those in your line of work?
>
> [Wheeler]: It's a very widely known fact in my line of work that sprinkler systems are the single most effective means of controlling and extinguishing fires and protecting the occupants and the building.
>
> [Counsel for the Szalacinskis]: Yet at the same time, true or false, sprinklers are mandated by law everywhere? Is that true? Does every code require sprinklers?
>
> [Wheeler]: Every code require[s] sprinklers in certain circumstances.
>
> [Counsel for the Szalacinskis]: Were they absolutely required here in this hotel?
>
> [Wheeler]: *No.*

(Emphasis added.) Wheeler went on to acknowledge during cross-examination that it was not unreasonable

for the owners of Grand Marquis to choose the compartmentalization design instead of a sprinkler system.

¶ 14. With respect to Wheeler's criticism that Grand Marquis failed "to establish and [en]force reasonable fire safety precautions against incendiaries such as smoking and candles," he testified that Grand Marquis should have had a policy in place with regard to such things and that that policy should have been communicated to guests. Wheeler did not elaborate on what the policy should have included. With regard to Grand Marquis' written procedure instructing staff of what to do in an emergency, Wheeler testified that it was inadequate, as was Grand Marquis' staff training in this regard. According to Wheeler, the procedure did not give adequate direction to the staff as to how to prevent fires, activate a fire alarm system, or how to properly assist guests in evacuation. Wheeler offered no further testimony regarding how the procedure should have been drafted.

¶ 15. In terms of Grand Marquis' failure to properly maintain the fire doors, he testified:

> We also heard the smoke traveled throughout the facility, meaning the fire doors not only didn't close properly, they probably didn't close at all. And what causes that is the smoke detectors in the corridors didn't sense or didn't operate properly. That's the only thing that fits the facts of the case.

¶ 16. With respect to the three deficiencies in the fire alarm system, Wheeler stated:

> There's at least three deficiencies that are apparent from the circumstances of the fire. The fire alarm system is required to have the following components in this hotel, in this particular hotel. It's required to have a smoke detector with an integral alarm in each guest room. It's required to have smoke detectors near the

300

fire doors that I've mentioned, that would be in the corridor, and it's required to have enunciation, via fire alarm horns, loud enough to alert occupants even if they're in their rooms sleeping.

¶ 17. According to Wheeler, smoke detectors in at least five individual rooms did not operate, nor did alarms in the hallway at Grand Marquis. Wheeler's opinion in this regard was based primarily on the reports of guests that they heard low-volume alarms, which he concluded was probably some small detector operating in another room. Wheeler admitted during trial that he did not conduct any sound testing of the alarms that were in Grand Marquis at the time of the fire; instead, his opinion that the alarm system was not loud enough was based on calculations.

¶ 18. When discussing the form of the verdict and jury instructions at the close of evidence, the trial court gave counsel an opportunity to make arguments. Other than discussing the wording of the question, counsel for the Szalacinskis had no further objection to submitting the special verdict with only the safe-place question. Counsel for the Gonnerings, however, objected to there being only one question, and argued that there should be two separate questions; one for ordinary negligence, and one related to safe-place law. The trial court denied the request for two separate questions.[8]

¶ 19. Based on its ruling, the only liability questions on the verdict with respect to Grand Marquis

---

[8] After the trial court's denial of her request for two separate questions, counsel for the Gonnerings requested that the jury be instructed that the safe-place standard is a higher standard than that which is employed in ordinary negligence cases. The trial court also denied this request.

301

inquired: "On September 15, 2001, was the **Grand Marquis Inn** negligent in failing to construct and maintain the premises of the hotel as safe as the nature of the premises would reasonably permit?" and if the answer was "yes," "Was such negligence of **Grand Marquis Inn** a cause of injury to the plaintiffs?"[9] (Bolding in original.) The jury answered "yes" to both questions.

---

[9] The questions and answers on the special verdict form pertaining to liability were as follows:

*QUESTION 1.* Was **Christopher Campbell** negligent with respect to the fire on September 15, 2001?

ANSWER: **Yes**

*QUESTION 2.* Was such negligence of **Christopher Campbell** a cause of injury to the plaintiffs?

ANSWER: **Yes**

*QUESTION 3.* Was **Tameka Lukes** negligent with respect to the fire on September 15, 2001?

ANSWER: **Yes**

*QUESTION 4.* Was such negligence of **Tameka Lukes** a cause of injury to the plaintiffs?

ANSWER: **Yes**

*QUESTION 5.* On September 15, 2001, was the **Grand Marquis Inn** negligent in failing to construct and maintain the premises of the hotel as safe as the nature of the premises would reasonably permit?

ANSWER: **Yes**

*QUESTION 6. [Only if you have answered Question 5 "yes," then answer this question:]* Was such negligence of **Grand Marquis Inn** a cause of injury to the plaintiffs?

ANSWER: **Yes**

*QUESTION 7.* On September 15, 2001, was **Patricia Szalacinski** negligent with respect to her own safety?

ANSWER: **Yes**

302

¶ 20. Following an eleven-day trial, the jury apportioned contributory negligence as follows for the injuries sustained by Patricia: Campbell, 20%; Lukes, 25%; Grand Marquis, 50%; and Patricia, 5%.[10] The jury awarded a total of approximately $492,500 in damages to Patricia; $56,200 to Robert; $22,500 to Leon; and $19,400 to Shirley.

¶ 21. Post-verdict, the trial court upheld the verdict. The trial court noted that a "laundry list" of purported defects was presented to the jury. The court declined to address each one independently, and instead stated: "I think many of them are completely insufficient as theories of negligence, either because there's simply no basis to find negligence or no causal connection." To uphold the verdict, however, the trial court found that there was sufficient evidence of the inadequate volume of the fire alarms, nonfunctioning smoke detectors, and the failure of at least one fire door to work. In addition, the trial court determined that American Family Insurance could only recover on its cross-claim from the proceeds paid by Campbell's and Lukes' insurers once Patricia was "made whole" on her damage award.

***QUESTION 8.*** *[Only if you have answered Question 7 "yes,"* *then answer this question:]* Was such negligence of **Patricia Szalacinski** a cause of injury to her?

ANSWER: **Yes**

(Formatting and bolding as it appears in original.) The first four questions on the special verdict form were answered "yes" by the trial court.

[10] The parties agreed to submit only one contributory negligence question to the jury and the jury's allocation would then be used to determine the recoveries of the other plaintiffs.

¶ 22. Grand Marquis and American Family Insurance now appeal. The Szalacinskis cross-appeal. Additional facts are provided in the remainder of this opinion as needed.

## II. ANALYSIS.

*A. Insufficient evidence to support finding of safe-place violation.*

¶ 23. Grand Marquis argues that there was insufficient evidence to support a finding that the safe-place statute was violated. "After a jury verdict is returned, any party may, by motion, challenge the sufficiency of the evidence to support the verdict or any answer thereof." *Ferraro v. Koelsch*, 119 Wis. 2d 407, 410, 350 N.W.2d 735 (Ct. App. 1984). "Our review of a jury's verdict is narrow. Appellate courts in Wisconsin will sustain a jury verdict if there is any credible evidence to support it." *Morden v. Continental AG*, 2000 WI 51, ¶ 38, 235 Wis. 2d 325, 611 N.W.2d 659. Credible evidence is that evidence which excludes speculation or conjecture. *See Bumpas v. DILHR*, 95 Wis. 2d 334, 343, 290 N.W.2d 504 (1980). " 'Speculation and conjecture apply to a choice between liability and nonliability when there is no reasonable basis in the evidence upon which a choice of liability can be made.' " *Merco Distrib. Corp. v. Commercial Police Alarm Co.*, 84 Wis. 2d 455, 460, 267 N.W.2d 652 (1978) (citations omitted). We cannot uphold a judgment based on " 'conjecture, unproved assumptions, or mere possibilities.' " *Id.* at 461 (citation omitted).

¶ 24. Here, the only basis for liability against Grand Marquis, which was submitted to the jury, was under safe-place law. *See* WIS. STAT. § 101.11(1)

(2001–2002).[11] The relevant question on the special verdict read: "On September 15, 2001, was the **Grand Marquis Inn** negligent in failing to construct and maintain the premises of the hotel as safe as the nature of the premises would reasonably permit?"

¶ 25. "The safe place statute does not create a new cause of action, but it does establish an increased standard of care, the violation of which is negligence." *Gould v. Allstar Ins. Co.*, 59 Wis. 2d 355, 361, 208 N.W.2d 388 (1973). Whereas ordinary negligence pertains to acts, the safe-place statute pertains to unsafe

---

[11] WISCONSIN STAT. § 101.11(1) provides:

Every employer shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which shall be safe for employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. Every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building as to render the same safe.

"Safe" is defined at WIS. STAT. § 101.01(13) as:

[S]uch freedom from danger to the life, health, safety or welfare of employees or frequenters, or the public, or tenants, or fire fighters, and such reasonable means of notification, egress and escape in case of fire . . . as the nature of the employment, place of employment, or public building, will reasonably permit.

The parties do not dispute that Grand Marquis is a public building or that the Szalacinskis and the Gonnerings were frequenters within the meaning of the safe-place statutes.

All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

conditions. *See Megal v. Green Bay Area Visitor & Convention Bureau, Inc.*, 2004 WI 98, ¶ 9, 274 Wis. 2d 162, 682 N.W.2d 857.

■

¶ 26. Under safe-place law, if an alleged defect is attributable to the failure to safely repair or maintain, the law requires proof of actual or constructive notice; in contrast, if an alleged defect is attributable to a defect in the original structural design or construction, an owner or employer is liable regardless of whether he or she knew or should have known of the defect. *See Barry v. Employers Mut. Cas. Co.*, 2001 WI 101, ¶¶ 22–23, 245 Wis. 2d 560, 630 N.W.2d 517. The Szalacinskis concede in their brief that notice was required by arguing that the evidence presented at trial established the Grand Marquis had actual notice of a non-structural defect in its alarm system and that there was a problem with its fire door. Nowhere in their brief do the Szalacinskis argue that notice was not required because the defects were related to the original structural design or construction.[12]

■

¶ 27. "Under the common law, premises were merely required to be reasonably safe; but under the safe place statute, liability is imposed if the premises are not kept as free from danger as the nature of the place will reasonably permit." *Gould*, 59 Wis. 2d at 361. Safe-place law, however, "does not require an employer or an owner of a public building to be insurers of frequenters of the premises." *Megal*, 274 Wis. 2d 162, ¶ 9. Instead, our supreme court has held:

---

[12] We rely on the Szalacinskis' brief and disregard conflicting arguments made by their counsel during oral argument that notice was not required because the defects were structural.

"[S]afe" is a relative term. "Safe" does not mean completely free of any hazards. What constitutes a safe place "depends on the facts and conditions present, and the use to which the place 'was likely to be put.' " Just because a place could be made more safe, it does not necessarily follow that an . . . owner has breached the duty of care established by WIS. STAT. § 101.11(1).

*Megal*, 274 Wis. 2d 162, ¶ 10 (citations omitted).

In determining whether the Safe Place Statute has been violated, Wisconsin law is that where the [agency having power to adopt orders to secure the safety of employees and frequenters of public buildings] has issued a safety order concerning a particular situation, it thereby establishes what is safe, and a jury or court cannot establish any other standard.

*Bean v. United States*, 219 F. Supp. 8, 10 (E.D. Wis. 1963) (citing *Candell v. Skaar*, 3 Wis. 2d 544, 551, 89 N.W.2d 274 (1958)); *see also Waterman v. Heinemann Bros.*, 229 Wis. 209, 212, 282 N.W. 29 (1938) ("When the Commission has provided the necessary elements of safety applicable to a particular place it is not for the court or jury to establish others.").

¶ 28. In Wisconsin, the Department of Commerce is responsible for establishing "such reasonable standards or rules for the construction, repair and maintenance of places of employment and public buildings, as shall render them safe." WIS. STAT. § 101.02(15)(j).

When the commission does make a lawful order, and it is complied with, the safety of the place involved is conclusively established, at least in so far as the subject matter of the order is concerned. Thus, when an order of the commission is claimed to be applicable, the sole question is whether the structure conforms to the order. *If it does, the jury may not substitute its conclu-*

*sions as to its safety for those of the body vested by statute with the power to determine this matter.* Where there is no proper evidence of an order by the commission applicable to the situation, the jury must be left to determine the issue, and, unless the matter is one involving skill and science, opinion evidence is not admissible.[13]

*Bent v. Jonet*, 213 Wis. 635, 645, 252 N.W. 290 (1934) (emphasis and footnote added). Consequently, it is not within the purview of this court to impose its judgment as to what complies with the safe-place statute when the Department of Commerce has taken the problem into account and imposed standards and regulations it deems sufficient. *Cf. Bean*, 219 F. Supp. at 11 ("[T]he

[13] The courts statements in *Bent v. Jonet*, 213 Wis. 635, 645, 252 N.W. 290 (1934), were made in reference to Wis. Stat. 101.09, which provided the Industrial Commission with the power to make and enforce lawful orders for the purpose of securing the safety of employees and frequenters of public buildings. *Bent*, 213 Wis. at 645. Section 101.09 was subsequently renumbered Wis. Stat. 101.02(15)(a) by 1971 Wis. Laws, ch. 185, 1. Section 101.02 details the powers, duties, and jurisdiction of the Department of Commerce.

The Department of Commerce ultimately replaced the Industrial Commission as the entity responsible for carrying out the provisions of Wis. Stat. ch. 101. *See* 1995 Wis. Act 27, § 3614 (amending the definition of "Department" from the Department of Industry, Labor and Human Relations to the Department of Development); 1995 Wis. Act 27, § 9116(5)(a) (substituting the term "Department of Commerce" wherever the term "Department of Development" appeared in the statutes, as affected by the acts of 1995); see also *DaimlerChrysler v. LIRC*, 2007 WI 15, ¶ 14 n.8, 299 Wis. 2d 1, 727 N.W.2d 311, *reconsideration denied and opinion clarified by* 2007 WI 40, 300 Wis. 2d 133, 729 N.W.2d 212 (per curiam) ("In 1967, The Department of Industry, Labor, & Human Relations (the DILHR) was created from the former Industrial Commission.").

court is in no position to impose its judgment as to what complies with the Safe Place Statute when the Industrial Commission has considered the problem and issued an order covering the situation.").

¶ 29. We now turn to the alleged defects, which the Szalacinskis argue are supported by sufficient evidence to uphold the jury verdict.

1. Compartmentalization.

■

¶ 30. The evidence was uncontested that compartmentalization was a code-compliant alternative to a sprinkler system. In response to Grand Marquis' argument that code compliance precludes liability under safe-place law, the Szalacinskis disagree and argue that "[a] code is a minimum standard." That the code is a minimum standard does not, however, negate the case law cited above, which makes clear that code compliance precludes safe-place liability and takes the matter out of the jury's hands.[14] *See Bent*, 213 Wis. at 645 ("[T]he jury may not substitute its conclusions as to its safety for those of the body vested by statute with the power to determine this matter."). If the Szalacinskis wanted to argue that Grand Marquis acted negligently in failing to go above and beyond the code requirements, it was their responsibility to ensure that a negligence question was on the special verdict form or to raise a specific objection to the lack of such a question. *See Megal*, 274 Wis. 2d 162, ¶ 9 ("[T]he safe-place statute addresses unsafe conditions, not negligent acts."); *Wright v. Mercy*

---

[14] One of Grand Marquis' experts testified that describing the code requirements as minimum standards does not mean that minimum safety results from compliance. Rather, the code sets forth what is needed to provide an acceptable level of safety, but allows for further steps to be taken if desired.

*Hosp. of Janesville, Wis., Inc.*, 206 Wis. 2d 449, 463, 557 N.W.2d 846 (Ct. App. 1996) (In order to preserve an objection to the verdict for appeal, a party must make "a specific objection which brings into focus the nature of the alleged error."). They failed to do either.

¶ 31. The unrefuted trial testimony of Nagel, the professional engineer who designed Grand Marquis, that 99% of comparable hotels in the Wisconsin Dells/Lake Delton area do not have sprinkler systems, further supports our conclusion that safe-place liability cannot result from Grand Marquis' compartmentalization design. "[T]he duty to construct a public building as safe as its nature will reasonably permit is satisfied by a showing that the building is constructed in accordance with accepted practices, even though some other practice might have rendered the building more safe."[15] *Balas v. St. Sebastian's Congregation*, 66 Wis. 2d 421, 426, 225 N.W.2d 428 (1975), *overruled in part on other grounds by Megal*, 274 Wis. 2d 162, ¶ 23. Thus, the fact that Grand Marquis utilized compartmentalization cannot form the basis for a finding that it violated safe-place law.

2. The alarm system and nonfunctioning smoke detectors in guest rooms.

¶ 32. No specific violation as to any code provision is identified by citation in the Szalacinskis' brief with

---

[15] The Szalacinskis emphasize the testimony of one of Grand Marquis' owners to the effect that "[i]f the money had been there," he would have installed sprinklers even though it was not required. Given the plethora of evidence establishing that compartmentalization was a code-compliant alternative to a sprinkler system, this testimony is of no consequence for purposes of establishing safe-place liability.

respect to Grand Marquis' alarm system. Instead, to support their argument that Grand Marquis had notice of defects with its smoke detectors, the Szalacinskis rely exclusively on a fire inspection report from approximately three months prior to the fire.

¶ 33. The inspection report indicates that there were no monthly test records for Grand Marquis' alarm system when the inspection was conducted. According to Inspector Jordan, who prepared the report, "[t]hat means that when I went in, the person at the desk was not able to produce at the time of the inspection the test record." As a result, Inspector Jordan asked an employee at Grand Marquis to test the system in front of him, which he subsequently found to be working properly. The inspection report had spaces available for Inspector Jordan to mark that the alarm system was "Inadequate" and "Defective." Neither space was marked. Although there was a mark in the fire inspection report near the entry for smoke detectors, Inspector Jordan explained that the mark related to an extra smoke detector, which was not required by the code, that was located in a nonpublic area. Thus, the evidence presented reflects that at the time of the fire, Grand Marquis had every reason to believe that its alarm system was code compliant and functioning properly.

¶ 34. According to the Szalacinskis, there was credible evidence to support a finding that safe-place law was violated due to nonfunctioning smoke detectors. Other than citing the trial court's remarks to this effect, and Patricia's testimony regarding her observations of smoke and the actions she and Robert took following these observations, no record citations are provided. In essence, the Szalacinskis rely on the inference that the smoke detectors failed to function based on statements of some of Grand Marquis' guests that

they did not hear their room smoke detectors.[16] We cannot conclude that the Szalacinskis have established credible evidence of nonfunctioning smoke detectors. An inference such as the one they are relying on is dependent upon " 'conjecture, unproved assumptions, [and] mere possibilities,' " all of which are insufficient to uphold a judgment. *See Merco Distrib. Corp.*, 84 Wis. 2d at 461 (citation omitted).

¶ 35. However, even if we were to determine that the evidence was sufficient to establish that the alarm system or smoke detectors were defective, we would nevertheless conclude that that there was no evidence that Grand Marquis had notice of these defects.[17] *See Barry*, 245 Wis. 2d 560, ¶ 23 ("[W]here the property condition that causes the injury is an unsafe condition associated with the structure, this court has grafted a notice requirement onto the safe place statute."); *Naaj v. Aetna Ins. Co.*, 218 Wis. 2d 121, 128, 579 N.W.2d 815 (Ct. App. 1998) ("We conclude that an alarm system is not part of the structural composition of the building."). Fire Chief Schultz testified during his deposition that the Delton Fire Department conducted semi-annual

[16] This inference overlooks the fact that some of the smoke detectors may not have gone off due to the fact that there was no smoke in the rooms.

[17] The Szalacinskis contend that Patricia was awoken "*too late*, as was the slumbering hotel owner, who at a minimum took 24 minutes extra to wake up and finally call 9[-]1[-]1." (Emphasis in brief.) Following oral argument, the Szalacinskis were allowed to add record citations to support the purported "24 minute gap," which were omitted in their briefs. We have also considered Grand Marquis' response to the Szalacinskis' motion to supplement their brief and are in agreement with Grand Marquis that even if there was a twenty-four minute gap, there was no evidence that Grand Marquis had prior notice of a defect with the alarm system.

inspections of Grand Marquis and that the available records did not show any violations or deficiencies related to the alarm system. Inspector Jordan confirmed that as of the last inspection before the fire, which took place roughly three months prior, the fire alarm system was code compliant. Even after the fire, when both Inspector Jordan and Fire Chief Schultz retested the alarm system, they concluded that it was sufficiently loud. As for the fire detectors in the guest rooms, the Szalacinskis have not made any arguments related to what notice Grand Marquis had of this alleged defect, and it is not our job to do so for them. *See State v. Gulrud,* 140 Wis. 2d 721, 730, 412 N.W.2d 139 (Ct. App. 1987) (This court declines to develop appellate arguments for the parties.). Thus, we conclude that there is no credible evidence to support a finding that Grand Marquis had notice that its alarm system or fire detectors were defective.

3. Fire doors.

¶ 36. The Szalacinskis also argue that there was sufficient evidence of a nonworking fire door to support the jury's verdict. They primarily rely on Fire Chief Schultz's deposition testimony, which was read to the jury at trial, that one fire door failed to seal tightly on the date of the fire and smoke escaped.

¶ 37. The only evidence of any prior notice related to an issue with a fire door was when a fire *exit* door on the third floor of the hotel was propped open and documented in a fire inspection report prepared sixteen months before the fire. This was not the same door referenced by Fire Chief Schultz, which was located on the second floor. Furthermore, no problems with the fire doors were noted in the fire inspection report from three months prior to the fire. Inspector Jordan testi-

fied that when he conducted his inspection on that date, he observed the fire doors and concluded that they were in compliance with the applicable code. Inspector Jordan testified that if there were problems, that would have been something he would have noted in the inspection report. We again conclude that even if the evidence was sufficient to establish that a fire door was defective, there was no evidence that Grand Marquis had notice of the defect. *See Barry*, 245 Wis. 2d 560, ¶ 23.

### 4. Other alleged deficiencies.

¶ 38. The Szalacinskis also reference "[a] constellation of deficiencies . . . any one of which is enough to uphold the verdict." Their first argument as to a deficiency is that they were entitled to the first-floor accommodations they requested. One of Grand Marquis owners testified that there were no first-floor rooms available when the Szalacinskis registered to stay there.[18] Other than conclusory allegations that such accommodations are required, the Szalacinskis have cited no code, statutory provision, or case law to support their position that Grand Marquis was somehow required to accommodate them.[19] We have said previously that we will not consider an argument "without legal authority specifically supporting the relevant propositions." *Young v. Young*, 124 Wis. 2d 306, 312, 369

[18] Although the Szalacinskis cite to records documenting that two first-floor rooms were given to guests who arrived later that evening; the record is unclear as to whether these individuals had reservations prior to their arrival.

[19] Counsel for the Szalacinskis acknowledged during oral argument that the Szalacinskis presumably could have gone to another hotel in the Wisconsin Dells area to obtain a first-floor room.

N.W.2d 178 (Ct. App. 1985). Furthermore, the Szalacin-skis' accommodation theory is grounded in ordinary negligence because it focuses on actions that they believe should have been taken to accommodate them as opposed to focusing on unsafe conditions, which is the crux of liability under safe-place law. *See Megal*, 274 Wis. 2d 162, ¶ 9.

¶ 39. The Szalacinskis also assert that the written fire safety procedures that Grand Marquis provided to its staff were deficient; however, no evidence was presented at trial that would establish what should have been done in this regard. When it decided the parties' motions after verdict, the trial court stated: "There was just no evidence to show that a longer evacuation plan ought to have been written, what it ought to include and how that would have made any difference in this case. To simply say your evacuation plan was short doesn't really say anything at all." We agree. Likewise, with respect to fleeting assertions that Grand Marquis was understaffed, the record is devoid of any evidence as to how it ought to have been staffed or how that would have made a difference.

■

¶ 40. The Szalacinskis argue that the burning of candles in the hotel was a code violation. The only evidence of this is Fire Chief Schultz's deposition testimony that Campbell's and Luke's burning of candles would have amounted to a code violation. The Szalacinskis do not provide a citation for the code provision they rely on or explain how Campbell's and Lukes' act of burning candles results in a finding that Grand Marquis violated the code. Because this argument is inadequately developed, we need not address it. *See Barakat v. DHSS*, 191 Wis. 2d 769, 786, 530 N.W.2d 392 (Ct. App. 1995) (reviewing court need not address "amor-

phous and insufficiently developed" arguments); *State v. Pettit*, 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992) (appellate court "cannot serve as both advocate and judge" by developing arguments for the parties).[20]

¶ 41. Finally, with respect to the Szalacinskis' contention that the nonopening windows violated safe-place law, Nagel and one of Grand Marquis experts testified that operable windows were not required under the code. There is no evidence to the contrary. In addition, the Szalacinskis argument that access to the pool side of the Grand Marquis somehow violated safe-place law also fails. Fire Chief Schultz testified that there was sufficient access to all sides of Grand Marquis, in compliance with the code. Just as the evidence establishing that Grand Marquis code-compliant compartmentalization design precluded a finding of safe-place liability, neither the windows nor the issue of access to Grand Marquis can support a finding of safe-place liability. *See Bent*, 213 Wis. at 645.

¶ 42. In sum, we conclude that the evidence presented at trial was insufficient to establish defects upon which a finding of safe-place liability could be based. Because of this conclusion, we do not address Grand Marquis' arguments that there was no causal connection between a hotel defect and the injuries alleged and that its conduct was not a cause of injury. *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) (cases should be decided on the "narrowest possible ground"). As a result, the jury's verdict must be

---

[20] As Grand Marquis points out, the Szalacinskis failed to discuss whether Grand Marquis had prior notice of any of these purported deficiencies. However, because there is insufficient evidence in the record to support any of the alleged deficiencies, we do not address the notice issue further.

reversed because of the lack of credible evidence to support a finding that safe-place law was violated. *Cf. Ferraro*, 119 Wis. 2d at 413 (concluding that reversal and dismissal of complaint was warranted where there was a lack of credible evidence to support the jury's verdict).

¶ 43. Although the Szalacinskis alleged negligence and reckless disregard on the part of Grand Marquis, we conclude that these theories were abandoned because the Szalacinskis failed to request that additional questions related to those theories be included on the special verdict. *See* WIS. STAT. § 805.13(3) (2003–04);[21] *see also Wright*, 206 Wis. 2d at 463. Counsel for the Gonnerings objected to the form of the special verdict, specifically requesting two separate questions, one for negligence and one related to safe-place law; however, the Gonnerings waived the new-trial alternative to reversal by failing to submit appellate briefs. *See State v. Johnson*, 184 Wis. 2d 324, 344, 516 N.W.2d 463 (Ct. App. 1994) ("On appeal, issues

---

[21] WISCONSIN STAT. § 805.13(3) (2003–04) provides:

(3) INSTRUCTION AND VERDICT CONFERENCE. At the close of the evidence and before arguments to the jury, the court shall conduct a conference with counsel outside the presence of the jury. At the conference, or at such earlier time as the court reasonably directs, counsel may file written motions that the court instruct the jury on the law, and submit verdict questions, as set forth in the motions. The court shall inform counsel on the record of its proposed action on the motions and of the instructions and verdict it proposes to submit. Counsel may object to the proposed instructions or verdict on the grounds of incompleteness or other error, stating the grounds for objection with particularity on the record. *Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict.*

(Emphasis added.)

raised but not briefed or argued are deemed abandoned."). Instead, the Gonnerings adopted the Szalacinskis' briefs, which do not, and, in fact, could not, seek that relief due to the waiver of the issue before the trial court.

B. *American Family Insurance did not waive its cross-claim and its recovery is not subject to the made whole doctrine.*[22]

¶ 44. American Family argues that its cross-claim was fully established, that it is not subject to the made whole doctrine, and that it is entitled to recover from the money paid by Campbell's and Lukes' insurers. We agree.

¶ 45. In dismissing Campbell, Lukes, and their insurers prior to trial and approving the tender of their insurance policy limits, the trial court entered orders stating: "Tameka M. Lukes is causally negligent as a matter of law and shall be so found by the court on the special verdict"; and, "Christopher A. Campbell is causally negligent as a matter of law and shall be so found by the court on the special verdict." At trial, the parties stipulated to the amount of Grand Marquis' damages. Accordingly, the trial court answered the following questions on the special verdict for the jury:

> **QUESTION 1.** Was **Christopher Campbell** negligent with respect to the fire on September 15, 2001?
>
> ANSWER: **Yes**

. . . .

---

[22] To the extent that there were overlapping variations of arguments made by the Szalacinskis in their response brief and cross-appeal, we address them in this section.

318

*QUESTION 3.* Was **Tameka Lukes** negligent with respect to the fire on September 15, 2001?

ANSWER: **Yes**

. . . .

*QUESTION 16.* What sum of money, if any, will fairly and reasonably compensate the **American Family Insurance Co.** for damages sustained by the Grand Marquis Inn as a natural and probable result of the fire on September 15, 2001.

ANSWER: **$ 543,739.40**

(Formatting and bolding as it appears in original.)

■

¶ 46. Omitted from the special verdict was any question related to contributory negligence on the part of Grand Marquis with respect to its damages. The burden to put forth evidence that Grand Marquis was contributorily negligent in this regard was on the parties asserting it. *See Helmbrecht v. St. Paul Ins. Co.*, 122 Wis. 2d 94, 121, 362 N.W.2d 118 (1985). In the absence of such evidence, Grand Marquis was not required to prove the negative. In light of the trial court orders that Lukes and Campbell were causally negligent, if the Szalacinskis wanted the jury to attribute negligence to Grand Marquis, they needed to submit a contributory negligence verdict question for the court's consideration and make the appropriate arguments. *See* Wis. Stat. § 805.13(3) (2003–04). The Szalacinskis' failure to do so waived their argument that liability was not established for Grand Marquis' property damages. *Id.*

¶ 47. The Szalacinskis point to statements made by counsel for American Family Insurance, after the jury began deliberating, inquiring as to the necessity of

319

special verdict questions referencing that the negligence Campbell and Lukes caused property damage to Grand Marquis. In making these statements, counsel for American Family Insurance maintained:

> I don't think we need to [add questions referencing that the negligence of Campbell and Lukes caused property damage to Grand Marquis]. I thought that it was understood based on our conversations and based on the stipulations already of record.
>
> But upon caution I talked to counsel, trying to confirm that was the case and have not [been] met with full willingness to agree to that. ·

Although the Szalacinskis urge us to do so, we do not consider these statements to be a "direct admission" contradicting American Family Insurance's argument that there were no issues of fact that needed to be decided to establish its cross-claim. During his discussions with the court and counsel, counsel for American Family Insurance consistently stated his understanding that "given the stipulations of the parties, both with respect to the causal negligence of Campbell and Lukes and with regard to American Family's damages, it was my understanding that as a result of that stipulation, there was no need to send any factual issue to the jury with regard to American Family's claim." The fact that he brought to the court's attention that this understanding in this regard may have been incorrect based on subsequent discussions with counsel does not amount to an "acknowledge[ment of American Family Insurance's] failure to request the special verdict questions concerning causation of its damages," as the Szalacinskis allege. American Family Insurance's counsel's understanding was confirmed by the trial court when it decided the parties' motions after verdict:

320

It seems to be clearly what was understood by the parties. And while those orders don't specify causal negligence as it's distinguished between causing injury and causing property damage – and it may well be that the difficult period just before trial when a lot of issues were being dealt with and nobody thought that that distinction was important – there seems to be no question that there was an agreement that Campbell and Lukes were causally negligent both as to causing the injury and causing the property damage and would and should be found negligent.

¶ 48. Given the absence of a special verdict question related to Grand Marquis' contributory negligence as to its property damage, the Szalacinskis' argument that American Family is barred from subrogation recovery because Grand Marquis' negligence was greater than that of Lukes and Campbell also fails. There was no question on the verdict as to Grand Marquis' liability for its property damage. Because there was no question regarding whether Grand Marquis was causally negligent for its own property damage and no percentage attributed to Grand Marquis for contributory negligence in this regard, contrary to the Szalacinskis' position, WIS. STAT. § 895.045 (2003–04) does not bar recovery by American Family Insurance.

¶ 49. In addition, we are not persuaded by the Szalacinskis' argument that equity precludes American Family Insurance from recovering as a cross-claimant from the surplus of the insurance proceeds paid by the insurers for Campbell and Lukes. They contend that "[a] property subrogee should not recover unless and until injured human beings make a complete recovery, especially as here where American Family's insured injured the Szalacinskis." This argument is not sup-

ported by relevant legal authority; accordingly, we do not consider it further. *See Young*, 124 Wis. 2d at 312.

¶ 50. The Szalacinskis also argue, and the trial court agreed, that they must be made whole before Grand Marquis can recover on its cross-claim from the proceeds paid by Campbell's and Lukes' insurers. The trial court's decision on this point was in error.

¶ 51. The made whole doctrine arises in the context of subrogation law and dictates that an insured is entitled to be made whole before its insurer can share in the amount recoverable from the tortfeasor who caused the loss. *See Garrity v. Rural Mut. Ins. Co.*, 77 Wis. 2d 537, 541, 253 N.W.2d 512 (1977). "[U]nder subrogation a subrogee succeeds to the legal rights or claims of another (subrogor). Thus a subrogee is one who steps into the shoes of the subrogor to the extent it has made payment as a result of the actionable event." *Wilmot v. Racine County*, 136 Wis. 2d 57, 63, 400 N.W.2d 917 (1987) (citation omitted; parenthetical in *Wilmot*).

¶ 52. Here, American Family succeeded to the legal rights and claims of *its* insured, Grand Marquis, and consequently, stepped into Grand Marquis' shoes to the extent it made payment as a result of the fire. *See id.* American Family is not subrogated to the rights of the Szalacinskis; therefore, the made whole doctrine has no application as between American Family Insurance and the Szalacinskis. Its application would only be appropriate as to the Szalacinskis if *their* insurer sought to recover in this action before they were made whole.

¶ 53. In sum, because there was insufficient evidence from which a reasonable jury could find that Grand Marquis violated safe-place law, we direct the

trial court to vacate the awards of damages to the Szalacinskis and the Gonnerings and dismiss their claims. Because American Family Insurance's cross-claim was fully established and the made whole doctrine does not apply, we further direct the trial court that American Family Insurance should recover from the proceeds of the policy limits paid by the insurers of Lukes and Campbell.[23]

*By the Court.*—Judgments reversed and cause remanded with directions.

---

[23] This opinion has no effect on the judgments awarded to the plaintiffs from which Grand Marquis and American Family Insurance did not appeal.